Filed 8/19/24  In re J.A. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>S.A.,<br><br>        Defendant and Appellant. | E083049, E083588<br><br>(Super.Ct.No. DPRI2300122)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.

Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court denied defendant and appellant N.V.'s (mother) Welfare and Institutions Code section 388[1] petition and terminated her parental rights as to J.S. (minor, born April 2023). On appeal, mother contends the court erroneously applied the caretaker preference in denying her section 388 petition for placement of minor with a nonrelated extended family member (NREFM),[2] R.F.[3] Mother additionally maintains plaintiff and respondent, the Riverside County Department of Public Social Services (the department), committed reversible error by failing to comply with their duty of inquiry with respect to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[4]

After mother gave birth to minor, she tested positive for amphetamines and opiates; minor tested positive for amphetamines and THC (tetrahydrocannabinol). Mother's prenatal records reflected she had previously tested positive for amphetamines while pregnant with minor. When the social worker arrived at the hospital, a nurse

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] A NREFM "is defined as an adult caregiver who has an established familial relationship with a relative of the child, as defined in paragraph (2) of subdivision (c) of Section 361.3, or a familial or mentoring relationship with the child. The county welfare department shall verify the existence of a relationship through interviews with the parent and child or with one or more third parties. The parties may include relatives of the child, teachers, medical professionals, clergy, neighbors, and family friends." (§ 362.7.)

[3] R.F. is the paternal aunt of minor's half sibling.

[4] We granted mother's motions to consolidate case Nos. E083049 and E083588 for purposes of briefing, oral argument, and decision.

reported that mother was difficult to wake and did not appear cognizant of the circumstances. The nurse had significant concerns as to minor's safety when left alone with mother; mother would not feed or change minor. Mother's progress notes reflected previous diagnoses of schizoaffective disorder, bipolar, and methamphetamine use.

Mother admitted smoking marijuana when interviewed by the social worker. She "did not appear coherent and only answered . . . questions using one-word responses." Mother denied mental health concerns but stated she was diagnosed with schizophrenia. She declined services, but asked for clothes for minor.

The guardian of mother's eldest child reported mother had been diagnosed with schizophrenia and bipolar disorder. "The guardian stated she has known the mother for 12 years and has watched the mother's mental health decline[]. The guardian became aware of mother's pregnancy in December 2022. She knew the mother was using methamphetamine as the mother had tested positive during a urine toxicology test at one of her prenatal appointments. The guardian stated the mother has been violent, aggressive and 'scary.'" "The guardian described an event on March 28, 2023[,] where she took the mother to a mental health appointment and the mother became erratic, screamed, yelled and was combative."

"The guardian described the mother as disconnected from reality and expressed her fears for [minor's] safety should [he] be allowed to go home with the mother. The guardian shared the mother was living with the maternal grandmother who was in denial that the mother suffers from severe mental illness. According to the guardian, the

3

maternal grandmother has blamed the mother for sexual abuse that happened to the mother as a child which has caused the mother's mental health to decline further. The guardian stated if [minor] were to be placed with relatives, the mother 'will come and break the windows, bang on the doors. They would not be safe.' The guardian expressed severe concerns for the mother's well-being and mental health status." On April 3, 2023, department personnel took minor into protective custody pursuant to a warrant.

Mother had a criminal history that included convictions for attempted auto theft, two separate convictions for assault with a deadly weapon, trespass, multiple counts of shoplifting, and a parole violation.

Mother had an extensive prior dependency history, including one case in which her reunification services as to her children D.W. and H.S had been terminated. H.S. had tested positive for marijuana at birth. Domestic violence and mental health issues had been alleged. The juvenile court had terminated the dependency and placed the children in a legal guardianship.

In the previous dependency proceeding, "ICWA inquiry was made as the mother mentioned potential Blackfoot Apache ancestry. However, it was determined ICWA did not apply to the proceedings." The social worker asked mother about any Native American ancestry, but mother was unable to complete coherent sentences during the interview.

"The maternal grandmother stated she believed the maternal grandfather has connections to the Cherokee Nation. In addition, she has connections with the Blackfoot

4

Apache tribe. The maternal grandmother stated no one in the family was a registered member to [either] Native tribe[].” The social worker reviewed the previous dependency proceeding; the juvenile court had found that ICWA did not apply to either mother or the maternal grandmother: “There has not been any new information since that dependency that would suggest ICWA would apply.”

On April 4, 2023, the social worker contacted the “ICWA Coordinator with the Blackfoot Apache tribe but the voicemail was full. Therefore, [she] sent an email to inquire about the mother’s connections to the Blackfoot Apache tribe.” On the same date she spoke with a representative of the Cherokee Nation. The social worker provided the representative “mother’s and maternal relative’s information, as well as the alleged father’s information.” The representative responded by email that minor was not an Indian child “in relation to the Cherokee Nation as defined in the Federal ICWA. Cherokee Nation will not be involved based on the information exactly as provided.”

On April 5, 2023, department personnel filed a section 300 juvenile dependency petition alleging, as to mother, that she had unresolved mental health issues (b-1), abused controlled substances (b-2), demonstrated a limited ability to care for minor (b-3), had a prior juvenile dependency history (b-4), and had an extensive criminal history (b-6).[5] On April 6, 2023, the court issued an order temporarily detaining minor.

On April 10, 2023, mother completed a Judicial Council Forms, form ICWA-020, in which she claimed that she might be a member of or eligible for membership in the

---

[5] The first amended petition filed May 15, 2023, made no changes with respect to the allegations pertaining to mother.

Blackfoot or Cherokee Indian tribes. The court directed the department to continue with its ICWA inquiry. The court noted, "I believe I saw in the detention report that they have done an inquiry previously." The court confirmed its order detaining minor.

In the April 26, 2023, jurisdiction and disposition report, the social worker recommended the court find the allegations in the petition true and deny mother reunification services pursuant to section 361.5, subdivision (b)(10) (termination of reunification services as to minor's sibling).[6] The social worker noted "in the last dependency . . . the mother stated she may have connections to the Blackfoot Apache tribe. [The department] completed an ICWA inquiry and determined ICWA did not apply." "On April 18, 2023, the mother initially denied any Native American ancestry. I informed her the ICWA-020 was filed on her behalf . . . indicating she may be a member of the Blackfoot/Cherokee tribe. The mother stated she has Native American ancestry."[7]

"On April 4, 2023, the maternal grandmother stated she believed the maternal grandfather has connections to the Cherokee Nation. In addition, she has connections with the Blackfoot Apache tribe. The maternal grandmother stated no one in the family was a registered member to [either] Native tribe[]." A social worker "reviewed a dependency when the mother was a minor and discovered that the Court found that ICWA

---

[6] The social worker also recommended the court deny services to the alleged father. Father never participated in the proceedings below and is not a party to the appeal.

[7] There is no explanation as to who filed the form on mother's behalf.

6

did not apply to the maternal grandmother nor the mother. There has not been any new information since that dependency that would suggest ICWA would apply."

A social worker contacted both tribes with mother's, the maternal grandmother's, and the maternal grandfather's information. A representative from the Cherokee Nation responded that minor was not an Indian child, and the tribe would not be involved in the proceedings.

In response to department inquires, the Yavapi-Apache Nation, Tonto Apache Tribe, the Fort Sill Chiricahua Warm Spring Apache Tribe, United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, Mescalero Apache Tribe, White Mountain Apache Tribe, and Jicarilla Apache Nation indicated that minor was not eligible for enrollment in the tribe, and that the tribes would not be intervening in the proceedings.

In the May 10, 2023, addendum report, the social worker noted that minor was "placed in an adoptive home and they expressed a desire to adopt [minor] if the parents fail to reunify." On April 24, and May 2, 2023, mother tested positive for amphetamine, methamphetamine, marijuana, and cocaine. Mother failed to show for testing on May 5, 2023.

At the contested jurisdictional hearing on May 15, 2023, the court found the allegations in the petition true. The court noted, "I don't know if we have enough information on ICWA." Counsel for the department responded, "The maternal grandmother said possible ancestry with Cherokee and Blackfoot Apache. We did

7

conduct further inquiry and filed noticing documentation with the Court on April 27th, 2023. We also followed up on further tribal responses on May 9th, 2023. We have received indication from three pertinent tribes that the child is not an Indian from the Cherokee Nation of Oklahoma, from the Yavapai-Apache, and Tonto Apache." Counsel indicated she would follow up at the next hearing. The court replied, "I don't have anything from the Cherokee Nation." Counsel responded, "That's in the further inquiry that was [filed on] April 27th, 2023."[8] The court found "ICWA does not apply."

In an addendum report filed June 28, 2023, the social worker recommended "temporary educational rights be granted to the current caregivers." Mother tested positive for methamphetamine on May 12, 2023, the day she entered a residential treatment program. On June 9, 2023, mother was terminated from a substance abuse "program due to testing positive for methamphetamine and admitting to using while" in inpatient treatment. On June 14, 2023, mother tested positive for amphetamine, methamphetamine, and marijuana.

On June 12, 2023, mother recommended the department place minor with a family friend, R.F.; mother provided the social worker with the friend's phone number and the social worker texted her that evening.

At the dispositional hearing on July 3, 2023, the department asked the court "to find that ICWA does not apply to this case at this time." Mother's counsel noted, "there's mention of an individual, [R.F.], who's interested in placement. I think she was referred

---

[8] Some of the tribes listed *ante* either did not respond until after the hearing, or the department did not submit the tribal responses until after the hearing.

8

to [Resource Family Approval (RFA)]. We would ask the Department to follow through on the RFA assessment for [R.F.]." The department noted that minor was placed with the caretakers on April 10, 2023.

The court removed minor from mother's custody, denied her reunification services, and set the section 366.26 hearing. The court found ICWA did not apply. On July 5, 2023, the court gave the caretakers temporary educational rights over minor.

On July 14, 2023, the caretakers applied for de facto parent status. On July 18, 2023, the court ordered a hearing on the caretakers' de facto parent request.

On August 18, 2023, mother filed a section 388 petition requesting the court place minor with R.F.[9] Mother alleged as a change in circumstance that the RFA process had begun prior to the dispositional hearing. Mother alleged the change of placement would be in minor's best interest because minor had no relations to the caretakers prior to placement, and, that if placed with R.F., minor could "build a relationship with his half-siblings, . . ." The court ordered an evidentiary hearing on the petition.

In an addendum report filed September 14, 2023, the social worker recommended the court deny mother's section 388 petition. RFA reported that R.F. was approved for emergency placement of minor "with concerns." An investigation into R.F.'s home revealed "that there were suspicious circumstances regarding a death at the home in 2021." The department was unable to obtain a police report for the alleged incident.

---

[9] The petition alleges that R.F. is "a paternal aunt to . . . minor's half-sibling."

The social worker reported, "At this time, the child remains placed in a stable placement. Placing the child in a new placement . . . is not in his best interest. On August 23, 2023, a Concurrent Plan Review was held[,] and it was determined that the permanent plan for the child is adoption." Minor "was placed in his placement on April 10, 2023, and these are the only parents he knows. In addition, the current caregivers currently hold [e]ducational rights for [minor]." "In addition, the caregivers have been granted De Facto Parent status by the Court on July 18, 2023."[10] "The caregivers have been vested in the care of [minor] and are making sure that all his needs are being met. Moving [minor] from the caregivers will not be in his best interest."

At a hearing on September 19, 2023, the department requested the court continue the hearing on mother's section 388 petition for the social worker to interview R.F. "It looks like the family friend was approved for emergency placement with concerns. There are, unfortunately, more details gathered through the Department interview of the family friend, [R.F.]. Unfortunately, the supervisor who interviewed her is out this week." The court directed the department "to circle back with the NREFM, [R.F.], to get additional information about the suspicious circumstances indicated in the . . . report."

In an addendum report filed September 26, 2023, the social worker related that R.F. "stated that her grandmother passed away on December 24, 2021, in her home." Her grandmother stopped breathing; she called 911 and performed CPR until the fire

---

[10] The juvenile court had only granted the caretakers *a hearing* on their request for de facto parent status. The court did not grant the caretakers' de facto parent request until November 17, 2023.

department arrived.  Twenty minutes later the fire department declared her grandmother dead.  Officers interviewed R.F. regarding the incident.  They later said, "they were going to close the investigation because they saw no evidence of foul play."  R.F. had no idea why it was labeled a "suspicious death."

At the hearing on September 27, 2023, the department urged the court to deny mother's petition based on minor's best interest.  Minor's counsel joined in the department's argument:  "Just would indicate to the Court that I don't see any indication that there has been any visitation that has occurred between the potential caregiver and the minor."  "There's no relationship, that I'm aware of, between the half sibling that is here today.  It's my understanding the half sibling doesn't reside with the prospective caretaker, so it's not a situation where the minor will be placed with a sibling."[11]  The caretakers have "had this minor, I believe, since April 10th and [are] fluent in all medical and developmental concerns.  That's the only relationship that the minor has had.  I understand he's very young.  But really by all accounts, I'm asking that the Court find it's in his best interest to remain in that home."

Mother's counsel conceded R.F. had not visited with minor or his half sibling, D.W.  Nonetheless, mother's counsel related D.W. "wants a relationship with his younger brother.  What has the Department done to facilitate that?  Zero.  Family connection.  I'm sure—you know, we use this term 'half sibling.'  I don't think [D.W.] sees [minor] as a half sibling.  He sees him as his little brother."  D.W. was in court in support of R.F.

---

[11] R.F. later testified that none of minor's siblings lived with her.

"He's had a long-time relationship with [R.F.], years and years. And he's here in support of [R.F.] The home was approved. The child should be placed there, or at least there should have been some type of contact between [D.W.], his younger brother, and [R.F], who is absolutely interested in placement and went through the hoops of resource family approval." R.F. was in court "asking for placement."

The court acknowledged that any delay in placing minor with R.F. "was caused by the Department itself, maybe rightfully, maybe wrongfully. That can't really be held against her. She came forward timely. She went through the process. She was approved, but for this suspicious death. And now the Department is saying that, well, . . . [maybe] there's no issue with that death, but the child—it's in the child's best interest to stay where he's at because he's been there so long. That's kind of circular reasoning there." The court inquired whether minor was determined to have "high needs."

Minor's counsel responded, "I believe so. [Minor] was being assessed for [Inland Regional Center (IRC) services]. I don't know what the status of his needs are, or what the plan is, but he was being assessed because of positive [drug] exposure."

The court noted that although minor required services, "he just started receiving [them] less than a month ago. So how is his best interest not served by placing him with a [NREFM]"?

Minor's counsel responded that minor had a relationship with the caretakers: "In terms [of] my client's best interest, that's why I would indicate I think it's best to stay

12

where he's at." In the alternative, minor's counsel asked for a "transition phase" between being withdrawn from the caretaker's home and being placed with R.F.

The court asked whether R.F. was able to take care of a high needs child. Mother's counsel responded, "I think she is more than capable of caring for the child." Counsel suggested that during visitation, R.F. could learn about any of minor's needs from the caretakers.

The court authorized placement of minor with R.F. "to be a transition of over the course of about a month or so, so that [R.F.] can come up to speed and understand all the special needs that this child will have, all the appointments." "I do want her to have visitation with the child, as well as the adult sibling. They both should be having regular visitation."

In the selection and implementation report filed October 16, 2023, the social worker recommended the court continue the section 366.26 hearing "to complete the Preliminary Adoption Study for the Prospective Adoptive Parent." The social worker also recommended the court find minor "is placed in the Permanent Plan of Adoption" with the caretakers.

The social worker noted, "At the Jurisdictional Disposition hearing held on July 3, 2023, the Court found that [ICWA] did not apply to the child . . . . No additional information regarding Native American ancestry has been provided by any individual during this reporting."

13

Mother's whereabouts were unknown. She had been arrested for burglary on October 3, 2023; she was released on October 6, 2023, and was on probation until October 5, 2024.[12] Minor had been determined to suffer from developmental delays.

Minor "is currently having visitation between [R.F.] and [D.W.] as stated by the Court as part of the transition plan." "The Department will be starting visits with [R.F.] on October 11, 2023. The visits will be for [two] hours each week and is a part of the transition plan the Court ordered in placing [minor] in [R.F.'s] care."

The social worker noted, "The Permanent Plan for [minor] is Adoption. The Department has identified two potential prospective adoptive options, the current caregivers and NREFM [R.F.]. Based on [minor's] age, adoption would be appropriate." "One preliminary adoption assessment has been completed and submitted for the current caregivers but the Department is waiting for the Court to address the [section] 388 Continued hearing regarding placement before making a referral for the new [prospective adoptive parents] to Adoption."

On October 25, 2023, the caretakers filed a caregiver information form for the purpose of aiding the court in determining whether to grant their request for de facto parent status. The caretakers described their home, marriage, and family life with minor and their two other adopted children. They included numerous photos of their family, including minor.

---

[12] Mother continued to be "involved in a criminal matter involving mental health court[]" for the duration of the proceedings.

The maternal grandmother, maternal aunt, two of minor's siblings, the caretaker, and R.F. all appeared at the hearing on October 31, 2023. The department requested a 120-day continuance to complete a preliminary adoption assessment. The department requested that the court make ICWA inquiries as to the relatives present at the hearing.

The attorney for the caregivers argued there was no relative preference at that point in time: R.F. "is not a blood relative of the child. And the only parents that this child knows is the current caretakers."

The court noted that while R.F. was a NREFM, "she has a sibling living with her. The child's sibling [is] living [with] her, so there's a degree of preference there." "This is an issue of preference, because we do have a [NREFM]. We do have a sibling residing with that [NREFM]. And the goal is to try to keep this child with family, if possible. And that's what we're dealing with."[13] "I fully appreciate that the prospective de facto parents, the caretakers, who have this child since April, it's a difficult decision to make. We have got a child, we have a [NREFM] who has asked for placement as far as back as —I want to say it was June. But for whatever reason, there were issues that came up that, you know, ultimately were brought to the Court's attention and clarified." "But at the end of the day, my charge is to do what's in the best interest of the child."

The court inquired as to any Native American ancestry of the maternal grandmother, maternal aunt, and minor's adult sibling. All indicated they were unaware of any such ancestry. The court found that ICWA did not apply to the case. The court

---

[13] As noted in footnote 10 *ante*, none of minor's siblings lived with R.F.

15

continued the hearing on section 366.26, the de facto parent request, and the section 388 petition.

On November 7, 2023, the caretakers filed a section 388 petition requesting the court change its order transitioning minor from their home to the home of R.F. The caretakers contended there had been a change of circumstances because a preliminary adoption assessment had been completed, which recommended the caretakers become the prospective adoptive parents. The caretakers noted that it was in minor's best interest to remain in their care because they had custody of minor since he was released from the hospital. They "have loved and cared for the child as though he were their biological child. They love him and want nothing more than to keep him in their care for prospective adoptive placement." They noted that minor had only had three visits with R.F. and one visit with his half siblings.

In the November 14, 2023, addendum report, the social worker recommended the court grant R.F. educational rights to minor as part of the court ordered transitional plan. The social worker detailed, "As part of the transition plan for [R.F.] the Department has started with [a] supervised visit [on] October 11, 2023. During the week of . . . November 22[] the Department will be looking to start unsupervised visits between [minor] and [R.F.]. After about a month of unsupervised visits, the Department will transition to overnight visits. These overnight visits will generally go on for a month. After the successful overnight visits, [minor] would be ready for placement with [R.F.]."

R.F. "has been having weekly supervised visit[s] with [minor] for [two] hours." The visits were reported to "have been going well. [Minor's] sister came to one visit and the brother and maternal grandmother have come to two visit[s]. It was reported that [R.F.] is attentive during the visit[s] and that she is trying to develop a bond with . . . [minor]." On November 16, 2023, the court ordered an evidentiary hearing on the caretakers' section 388 petition.

At the hearing on November 17, 2023, the court observed that two of minor's siblings, the maternal aunt, the maternal grandmother, and R.F. were present. The court queried the adult relatives regarding any Native American ancestry; they all responded they had none. The court granted the caretakers' de facto parent request.

The court authorized continued supervised visitation by R.F. with minor. However, the court wished to consider the caretakers' section 388 petition, "because at the end of the day we need to do what is in the best interest of this minor. [¶] We have got what appears to be—the caretakers and the [NREFM], both who appear to be amply qualified to take care of the child. The question is, what is in the best interest of the child." The court reserved ruling on granting R.F. educational rights to minor. The court continued the sections 366.26 and 388 hearings.

In the addendum report filed November 30, 2023, the social worker observed that R.F. "had supervised visits with [minor] at the [department] office on November 21, 2023[,] and November 27, 2023. [R.F.] arrived on time and was prepared for the visit. During the visit [R.F.] changed [minor], played with toys with [minor], held him up as he

17

took steps, fed him/burped him and changed him. [R.F.] also walked around holding [minor] and comforting him when he became upset. [Minor's] older brother . . . showed up to the visit on November 21, 2023, 35 minutes before the visit ended. [The sibling] interacted with [minor] by talking and playing with him during the visit. There were no issues during both of [R.F.'s] visits."

On December 5, 2023, mother filed a supplemental information in support of her section 388 petition. Included was a letter from R.F. expressing her desire and ability to have minor placed with her. She observed that minor's siblings insisted upon having a relationship with minor and that studies "show[ed] that a child [who] maintains a relationship with their biological family has a better life [*sic*] to maintain a sense of belonging and connection with relatives." Also included were numerous letters in support of placement with R.F., including letters from relatives. Numerous pictures of visits with minor were also attached.

At the hearing on December 6, 2023, the department requested minor be maintained with the caretakers. Minor's counsel agreed with the department. However, minor's counsel requested that "if there was going to be movement, that the transition happens swiftly because the minor has been placed with the current foster parents since he was about nine days old." Minor's counsel noted, "At this point, we believe it's in his best interest to remain where he's placed because that's really the only home and family he's aware of. They're aware of his medical needs, special medical needs, treatment plan."

Mother's counsel informed the court that mother wished minor to be placed with R.F. The caretakers' counsel argued "at this point in time, the caretaker preference applies under [section] 366.26[, subdivision] (k). And there's case law and other statutes that I put in my motion indicating that there's a preference to preserve appropriate placements when there's no need to move placements. At this point in time, there is absolutely no need to move placements. The child is doing great in the care of the de facto parents."

"My position is we don't even get to [section] 361.3 [NREFM preference] because there's a caretaker preference. There's not a relative preference. The Department has designated a plan in this case to be adoption. And we're not trying to determine what adoptive placement that would be. And the best interest indicate it would be continued with the de facto parents."

The court noted, "But what happened with the [section 366].26—and this is why I asked the question before we went on the record about [section] 366.26[, subdivision] (k), that subsection states that the caretaker preference comes in once adoption is designated as a permanent plan for the child. [¶] That's what happened on October 31st, and the motion was still pending. And so that's why I asked if the parties are prepared to address [section] 366.26[, subdivision] (k), because this is really at this point going to become a legal issue of whether or not the caretaker preference has kicked in, which once you have your first [section 366].26 and in the recommendations, if you look at the recommendations, adoption was adopted as a permanent plan for the child." "I think that

19

in itself with the caretaker preference coming in, the Court does find at this time the procedural posture of the case has changed since we have had a [section 366].26 and the permanent plan for adoption has been adopted by the Court."

The court ruled, "And at this point given the caretaker preference and even absent the caretaker preference, the fact that the child has been in this home for eight months, and there's no indication that there's any problems with the home that the child is in, the Court is going to deny . . . mother's motion, grant the de facto parents' motion, and leave the child in place."

The court permitted mother's counsel to call R.F. to testify in support of mother's petition. R.F. testified that she desired and was prepared to take custody of minor. She wanted to adopt him: "I feel like we as a family can give [minor] the best support. He has a lot of family. We work together as a team. Everyone loves him, even if they haven't met him, with the pictures and everything that I showed, even my children and my family. And we come together. We're a very tight knit family."

Minor's half sibling, D.W., testified R.F. would take good care of minor. D.W. wanted to continue to have contact with minor. "I just feel like he should be with his family, to be honest. Me and my sister [have] been separated before." "I just feel like he should be with his family, honestly."

The parties stipulated that if the caretakers testified, they would testify "that they are [in] favor of maintaining the sibling relationships between [minor] and any siblings and also any other appropriate relatives."

20

The court noted, "as indicated prior to the testimony, this is more of a legal issue than anything else.  The Court is looking at the best interest of the child and the caretaker preference has kicked in.  [¶]  We did have a [section 366].26 hearing.  The Court finds that there's nothing inappropriate with the current caretakers, and it is in the best interest of the child, for those reasons, to stay with the current caretaker.  [¶]  The caretakers have indicated they are willing to maintain a relationship between the child and the siblings, as well as any additional relatives."  The court affirmed its ruling.

The court ordered "the Department to work with [D.W.] and [R.F.] and the caretakers to see if they can agree to some sort of a workable [visitation] schedule."  The caretakers' counsel noted that they were open to allowing weekly unsupervised visits for a couple hours.

On December 13, 2023, the department filed an addendum report informing the court that the parties had agreed upon a visitation schedule.  "The Department is asking that the Court confirm the [section] 366.26 Selection and Implementation hearing set for February 28, 2024, and the 366.3 Post Permanency review hearing set for April 16, 202[4]."

At the hearing on December 15, 2023, the court ruled that R.F. was authorized to transport minor for visits and "to supervise the sibling visits.  The goal of these visits is for the siblings to have contact with the minor[].  So the siblings should be present at the visits."  The court confirmed the date for the section 366.26 hearing.

21

On February 9, 2024, the department filed an addendum to the section 366.26 report recommending the juvenile court terminate parents' parental rights, that minor remain in a permanent plan of adoption with the caretakers, and that visitation with the biological family be left to the discretion of the caretakers.

In another addendum report filed February 13, 2024, the social worker observed that minor "was placed with the identified prospective adoptive parents on April 10, 2023. The child continues to build a bond with his prospective adoptive parents, their children, extended family members and various friends of the prospective adoptive family. The prospective adoptive parents are excited to have [minor] become a permanent part of their family. They speak of him as if he was their own and [minor] has been doing well in their care. This is the only family [minor] knows and he has his medical, developmental, physical and mental health needs met."

The social worker attached the preliminary adoption study she asserted had originally been submitted on October 12, 2023:[14] "The family environment has been very stable and nurturing for [minor]. This has been the only home he has known[,] and he is building lifelong connections with the prospective adoptive family" "[T]he prospective adoptive parents are working to ensure his needs are met and he is building strong bonds with their family." "The prospective adoptive parents ensure all [minor's] physical, emotional, mental, and developmental needs are met daily. He exhibits comfort with his primary caregivers which is demonstrative of strong attachment." "The

---

[14] This is the first time the preliminary adoption study appears in the record.

22

prospective adoptive parents are supportive of post-adoption contact with extended relatives as appropriate."

At the hearing on February 28, 2024, the court noted "we do have relatives seated in the back of the courtroom. We have maternal grandmother. We have a godmother on mother's side. We also have an adult sibling, a brother who is present. And we have . . . [R.F.], as well. We have the caregiver for the child . . . ." Counsel for the department noted, "Your Honor, just to indicate on the record, all the family members present today have been present at previous hearings and were inquired about ICWA, about Native American ancestry. And so I just wanted to indicate on the record that that has been previously done." The court continued the section 366.26 hearing over the department's objection.

On March 20, 2024, R.F., D.W., and D.W.'s grandmother filed section 388 petitions requesting minor be placed in R.F.'s care. The court summarily denied the petitions on the basis that the requested change was not in minor's best interest.

At the hearing on March 21, 2024, the court noted, "We have the caregivers, both of them, maternal grandmother, the sibling, and then two [NREFM's]." The department argued, "we do have a favorable adoption assessment. This is a very young child, so we are asking for permanency in the form of a plan of adoption." Minor's counsel submitted on the recommendation but requested ongoing sibling visitation.

Mother's counsel complained about the department's failure to transition minor to R.F.'s home and failure to assist in visitation; he requested the court order sibling

visitation. The caretakers indicated they had no opposition to the court continuing the current visitation order.

The department noted, "I neglected to mention that further [ICWA] inquiry was triggered in this case. And I don't know that I indicated that on the record in prior hearings." "We did get information from several of the relatives, including mother, of possible Native American ancestry, with the following tribes: Blackfeet tribe, Apache tribe, and Cherokee tribe." "We generated further inquiry in this case and documentation was filed with the court on April 27th, 2023, May 9th, 2023, May 22nd, 2023, May 20th, 2023, July 11th, 2023, August 7th, 2023, and August 10th, 2023. All responses filed with the court and received by the Department have indicated the child is not an Indian child. So at this juncture, it does appear that we have no reason to believe that the child is an Indian child. And we ask the Court [to] make the finding that ICWA does not apply to this case."[15]

The court found that adoption was in minor's best interest and terminated parents' parental rights. The court noted that "[i]t is unusual for the Court to order visits after—at this point after termination of parental rights. In fact, I can't think of very many instances where I have allowed for that. It's typically left to the discretion of the caretakers. [¶] Given the history of this case, given that the Court has previously noted, this was an extraordinarily difficult case in that placement decisions were with two equally compatible homes. I didn't have a basis to deny one home over the other due to [R.F.] or

---

[15] Although the court did not orally respond to the department, the minute order reflects, "The Indian Child Welfare Act ('ICWA') does not apply."

the caretakers." "At this time, I am going to put in place an order that the visitation continue with [R.F.], as well as the siblings on prior terms. And my understanding is every other week." "So two hours every other week visitation will continue. Certainly[,] the parties can agree on more if they decide to do that." The court designated the caretakers as the prospective adoptive parents.

## II.  DISCUSSION

### A.  Application of the Caretaker Preference

Mother contends the court erroneously applied the caretaker preference in denying her section 388 petition for placement of minor with R.F. We hold any error was harmless.

Section 388 primarily permits a parent to petition the court "to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) "To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child." (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

"'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

"'Application of the [NREFM] preference throughout the reunification period is . . . supported by California's strong public policy favoring the facilitation of family reunification, because relative caregivers are more likely to favor the goal of reunification and less likely than nonrelative caregivers to compete with the parents for permanent placement of the child.' [Citation.] Consequently, courts should consider relatives who have come forward after an initial placement with a nonrelative, and [the department] can continue to search for relatives during the family reunification period of a case. [Citation.] For placement determinations after disposition, the statute requires [the department] to consider one additional factor: 'In addition to the factors described in [section 366.26,] subdivision (a), the county social worker shall consider whether the relative has *established and maintained a relationship with the child*.' [Citation.]" (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 491 (*Amber G.*).) There is "no authority that requires the Agency to develop a relationship between siblings that did not exist at the time a juvenile dependency petition was filed." (*In re S.M.* (2004) 118 Cal.App.4th 1108, 1122.)

"'Unlike the relative placement preference, the caretaker preference applies specifically to applications for adoption. [Section 366.26, s]ubdivision (k) provides, "Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child *over all other applications for adoptive*

26

*placement* if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional wellbeing.  [¶]  As used in this subdivision, 'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child.'"  [Citation.]"  (*Amber G.*, *supra*, 86 Cal.App.5th 465, 492-493; see *In re K.L.* (2016) 248 Cal.App.4th 52, 65-66 ["The section 361.3 relative placement preference does not apply where, as here, the social services agency is seeking an adoptive placement for a dependent child for whom the court has selected adoption as the permanent placement goal."].)

"Once reunification efforts have failed, and the juvenile court has before it a proposed permanent plan of adoption, it is the caretaker who has preference. [Citations.]"  (*In re M.M.* (2015) 235 Cal.App.4th 54, 63-64.)  "The relative placement preference does not apply to an adoptive placement; there is no relative placement preference for adoption.  [Citations.]  Instead, at the section 366.26 hearing, the court must apply the caretaker preference under section 366.26, subdivision (k)."  (*In re A.K.* (2017) 12 Cal.App.5th 492, 498.)

"[T]he circumstance that triggers the application of the caretaker preference is the intent to place the child for adoption, not necessarily the termination of parental rights or the termination of reunification services."  (*In re Lauren R.* (2007) 148 Cal.App.4th 841,

856; see *In re M.H.* (2018) 21 Cal.App.5th 1296, 1304.) "[T]he caretaker preference applies to applications for adoption both before and after the termination of parental rights, . . ." (*In re Lauren R.*, at p. 859; accord, *Amber G.*, *supra*, 86 Cal.App.5th at pp. 492-494].)

"Because a child's best interest evolves quickly, the legislators developed a spectrum of [placement] preferences . . . . These statutorily created preferences are not to be automatically applied and should not be treated the same as evidentiary presumptions. To the contrary, the statutes discussing each preference require the consideration of multiple factors all dependent on an examination of evidence relating to the minor's current circumstances. Consequently, a reflexive approach that children are always better off with relatives is incompatible with the governing laws . . . ." (*Amber G.*, *supra*, 86 Cal.App.5th at p. 489.) "[T]here is a preference in favor of keeping a child with caretakers in the process of adopting them unless something about the minor's current circumstances warrants their removal to a different home." (*Id.* at p. 504.)

"'The overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child. "[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more

28

important the child's need for continuity and stability becomes in the evaluation of her best interests. [Citation.]' [Citation.]" (*Amber G.*, *supra*, 86 Cal.App.5th at pp. 493-494.)

Here, even assuming arguendo that the court erred in applying the caretaker preference, the court acted within its discretion in denying mother's petition based on the court's determination that it was in minor's best interest that he remain in the caretakers' home. First, the caretakers had been caring for minor daily for months, whereas R.F. had relatively little contact with minor. The department placed minor with the caretakers on April 10, 2023, immediately upon minor's release from the hospital. Thus, at the time the juvenile court denied mother's petition on December 6, 2023, minor had been living with the caretakers for nearly eight months, and it was the only home minor had known.

On the other hand, R.F. and D.W. did not begin visiting with minor until October 11, 2023, six months after the department had placed him with the caretakers.[16] Since the department took minor into protective custody immediately after his birth, neither R.F. nor his siblings had a preexisting relationship with him. The visits were two hours each week. They never progressed beyond supervised visitation. Thus, at best, R.F. and D.W. had just shy of two months of visitation or approximately 10, two-hour visits with minor at the time the court denied mother's section 388 petition.

---

[16] As the court noted, this was not their fault. Nonetheless, the requirement that the court consider minor's best interest necessarily involved a comparison of the amount and quality of time minor had spent with the respective persons involved in the placement determination.

Second, placement with the caretakers had been successful. The caretakers were ensuring all minor's needs were met. The caretakers had an auspicious home, marriage, and family life with minor and their two other adopted children. Minor was bonded with the caretakers, their children, extended family members, and the caretakers' friends.

The caretakers' home had been stable and nurturing for minor. The caretakers "have loved and cared for the child as though he were their biological child. They love him and want nothing more than to keep him in their care for prospective adoptive placement." The caretakers understood all minor's medical and developmental issues. (*Amber G.*, *supra*, 86 Cal.App.5th at pp. 493-494 ["The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests. [Citation.]' [Citation.]"].)

Third, the caretakers' home was an adoptive placement. As early as May 10, 2023, three months prior to mother's filing of the section 388 petition, the department had identified placement with the caretakers as an adoptive home. A preliminary adoption study favorable to the caretakers had originally been submitted on October 12, 2023. On October 16, 2023, the social worker recommended the court find minor "is placed in the Permanent Plan of Adoption[]" with the caretakers.

Fourth, the court had previously recognized the fortuity of placement of minor with the caretakers. On July 15, 2023, the court gave the caretakers temporary

30

educational rights over minor. On November 17, 2023, the court granted the caretakers' de facto parent status.

Fifth, all the parties, except mother, repeatedly recognized that it was in minor's best interest to remain in the caretaker's home. Sixth, the caretakers repeatedly agreed to maintain minor's relationship with his siblings and other relatives. They even eventually agreed to what the court itself maintained was an "unusual" concession, a post-adoption order permitting continued visitation.

Seventh and finally, the court repeatedly, properly acknowledged that the best interest of minor was paramount in its determination of the appropriate placement for minor. "But at the end of the day, my charge is to do what's in the best interest of the child." "[B]ecause at the end of the day we need to do what is in the best interest of this minor." "The question is, what is in the best interest of the child." The court ruled, "And at this point . . . even absent the caretaker preference, the fact that the child has been in this home for eight months, and there's no indication that there's any problems with the home that the child is in, the Court is going to deny . . . mother's motion . . . and leave the child in place." "The Court is looking at the best interest of the child . . . ." "The Court finds that there's nothing inappropriate with the current caretakers, and it is in the best interest of the child, for those reasons, to stay with the current caretaker." The court's denial of mother's section 388 petition was well within its discretion.

B. ICWA

Mother contends the department erred by failing to inquire of the maternal grandfather regarding any Indian ancestry.[17] Mother alleges that although the social worker contacted tribal representatives with information about the maternal grandfather, the information she provided was "incomplete, and possibly unreliable." This is because the social worker provided the tribal workers with "variations of his name and different birth dates."

The department concedes that "the notice sent to the tribe contained multiple dates of birth for maternal grandfather."[18] However, the department maintains any error was harmless because they communicated with the only tribe to which the maternal grandfather was purportedly connected, and the "tribe responded that the family could not be located in the tribal records."

---

[17] Mother acknowledges that there is a split of authority as to whether the department is required to conduct an ICWA inquiry of extended family members when the child is taken into custody pursuant to a warrant. (*In re Delila D.* (2023) 93 Cal.App.5th 953, 962, review granted Sept. 27, 2023, S281447 (*Delila D.*); accord, *In re Jerry R.* (2023) 95 Cal.App.5th 388, 404; *In re V.C.* (2023) 95 Cal.App.5th 251, 258-259; see *In re D.M.* (2024) 101 Cal.App.5th 1016, 1047-1060 (dis. Opn. of Raphael, J.), review granted July 24, 2024. S285537; contra, *In re Robert F.* (2023) 90 Cal.App.5th 492, 504, review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-681, review granted July 26, 2023, S280572 [same]; *In re Andres R.* (2023) 94 Cal.App.5th 828, 842-856, review granted Nov. 15, 2023, S282054 [same]; *In re D.M.*, at p. 1023 [same].) However, we find it unnecessary to address the issue because we find any error harmless.

[18] There were two birth dates listed for the maternal grandfather. There were also two names listed for the maternal grandfather; however, the differences in those names consisted only of his full first name and its generic sobriquet.

We hold substantial evidence supported the court's determinations that ICWA did not apply.  Even assuming the department was required to make direct inquiries of the maternal grandfather, we hold any error was harmless.

"""""Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.]  The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.""""  [Citations.]  'State law, however, more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."""" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

"""""The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.'"  [Citation.]  "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."""" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.)

Mother and the maternal grandmother informed the social worker they might have Native American ancestry through the Blackfoot and Cherokee tribes, ancestry to the

33

latter tribe was purported to be through the maternal grandfather. The social worker made extensive inquires of minor's purported tribal connections with all relevant tribes mentioned by mother and the maternal grandmother. All the responding tribes indicated that minor was not eligible for enrollment, and that the tribes would not be intervening. The fact that the social worker gave the tribes two different birth dates for the maternal grandfather should not have impacted that determination; in fact, if someone had given the social worker both birth dates for the maternal grandfather, she would have been remiss in *not* including them *both*.

The maternal grandmother stated that no one in the family was a registered member of any Native tribe. The court repeatedly inquired of relatives in the courtroom regarding Indian ancestry; mother and the maternal grandmother, repeatedly and contradictorily, indicated they had no Native American ancestry. (*In re S.R.* (2021) 64 Cal.App.5th 303, 312, 316 [Where the parents represented that the minor did not have Native American ancestry, the court's ICWA finding was "plainly supported at the time it made the finding."].) The court's determinations that ICWA did not apply were supported by substantial evidence.

"[I]n ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 [The department "failed its duty of inquiry by not asking 'extended family members' . . .

34

whether there is reason to believe [the child was] an Indian child."]; compare *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578 ["[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding."]; contra, *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1003, 1006 ["[A]n automatic reversal approach to claims of ICWA inquiry errors is not compelled by the statute, harms the interests of dependent children, and is not in the best interests of Indian communities." "Plainly, complying with the literal language of the statute—that is, making an *initial* and *further* ICWA inquiry of every member of a child's extended family . . . is absurd at best and impossible at worst."]; contra, *In re M.B.* (2022) 80 Cal.App.5th 617, 629-630 [per se reversal where department and juvenile court failed their duties of ICWA inquiry].)

Obviously, appellate courts have come to myriad disparate conclusions regarding the harmless error standard applicable in cases in which the department has failed to make an "adequate" inquiry. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 608, and the cases cited therein.) The issue is presently before our Supreme Court in *In re Dezi C.*, *supra*, 79 Cal.App.5th 769, review granted September 21, 2022, S275578. We apply the precedent of our own district and division. (*In re Benjamin M.*, *supra*, 70 Cal.App.5th 735, 744.)

Here, to the extent the department neglected to make proper inquiry, the record does not reflect that there was any further "information that appears to have been both readily available and potentially meaningful." (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)  The maternal grandfather's address or phone number are not contained in the record, so it is difficult to understand how the social worker was supposed to contact him. He never appeared at any of the hearings nor was he present during any of the interviews conducted by the social worker.  He certainly was not "readily available."  Regardless, as discussed *ante*, the department made sufficient inquiries regarding the purported Indian ancestry of the maternal grandfather.

Moreover, in a previous dependency proceeding pertaining to minor's maternal half siblings, the juvenile court determined that ICWA did not apply.  No new information that would affect that determination had been forthcoming.  Thus, to the extent the department was even required to inquire of the maternal grandfather regarding Native American ancestry, any error was harmless.

### III.  DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____

Acting P. J.

We concur:

MILLER_____

J.

MENETREZ_____

J.